# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of ) | |
| *(Briefly describe the property to be searched or identify the* ) | Case No. 8:21-MJ-00561 |
| *person by name and address)* ) | |
| ) | |
| One Samsung Galaxy Note10+ cellular telephone, Model ) | |
| # SM-N975U, bearing International Mobile Equipment ) | |
| Identity ("IMEI") number 359271103372623, and ) | |
| assigned telephone number XXX-XXX-0157 ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1752(a)(1) | Entering and Remaining on Restricted Building or Grounds |
| 18 U.S.C. § 1752(a)(2) | Disorderly and Disruptive Conduct in a Restricted Building or Grounds |
| 40 U.S.C. § 5104(e)(2)(D) | Disorderly Conduct in a Capitol Building |
| 40 U.S.C. § 5104(e)(2)(G) | Parading, Demonstrating, or Picketing in a Capitol Building |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days *(give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Daniel Dales

_____
*Applicant's signature*

Daniel Dales, Special Agent (FBI)
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.
Date: _____

City and state: <u>Santa Ana, CA</u>

_____
*Judge's signature*

Douglas F. McCormick, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Paul C. LeBlanc (213) 393-6933

**AFFIDAVIT**

I, Daniel Dales, being duly sworn, declare and state as follows:

**I.  INTRODUCTION**

1.    I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since July 2017. I am currently assigned to the Los Angeles Field Office's Long Beach Resident Agency Joint Terrorism Task Force.  My duties include investigating violations of the laws of the United States, specifically investigations related to domestic and foreign terrorism.

2.    I have received both formal and informal training from the FBI regarding domestic and foreign terrorism investigations. Through my training and experience with the FBI, I am familiar with the methods of operation that individuals associated with domestic and foreign terrorist organizations employ—including their use of cellular phones, social media and online platforms such as Facebook, Instagram, and YouTube—to communicate with associates regarding their ideology, to organize actions on behalf of their organizations, and to bring attention to their political and social agendas. As a Special Agent, I have also participated in the execution of multiple search warrants, including search warrants executed at physical residences in cases involving domestic terrorism. Currently, I am a tasked with investigating criminal activity in and around the Capitol grounds on January 6, 2021. As a Special Agent I am authorized by law or by a Government agency to engage in or supervise the

prevention, detention, investigation, or prosecution of a violation of Federal criminal laws.

## II. **PURPOSE OF AFFIDAVIT**

3.     This affidavit is made in support of a warrant to search: one Samsung Galaxy Note10+ cellular telephone belonging to Lois Lynn McNicoll ("MCNICOLL"), Model # SM-N975U, bearing International Mobile Equipment Identity ("IMEI") number 359271103372623, and assigned telephone number XXX-XXX-0157 (the "SUBJECT PHONE"), further described in Attachment A, which is incorporated herein by reference, for evidence, fruits, and instrumentalities of violations of the following statutes, as described more fully in Attachment B, which is also incorporated herein by reference: 18 U.S.C. § 1752(a)(1) (Entering and Remaining on Restricted Buildings or Grounds); 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds); 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building); and 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building) (collectively, the "Subject Offenses").

4.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are

related in substance and in part only and all dates and times are approximate.

### III.  <u>**SUMMARY OF PROBABLE CAUSE**</u>

5.   As detailed more fully below, MCNICOLL was arrested for participating in the events at the U.S. Capitol on January 6, 2021.  MCNICOLL was arrested within the Central District of California on June 28, 2021.  FBI agents seized the SUBJECT PHONE incident to MCNICOLL's arrest, and the FBI maintains custody of the SUBJECT PHONE.

### IV.   <u>**Statement of Probable Cause**</u>

#### A.   **FBI Interview of MCNICOLL**

6.   On May 18, 2021, I interviewed MCNICOLL at her place of employment in a non-custodial capacity.  MCNICOLL was informed that any participation was voluntary and that she was free to terminate the interview at any time.  MCNICOLL affirmed that she understood.

7.   During the interview, MCNICOLL denied taking any photos or video while inside the Capitol.  MCNICOLL further claimed that her phone was inside her purse, which was inside her jacket, neither of which she ever removed.  I know these claims are inconsistent with what Capitol CCTV shows.

8.   As described more fully in Exhibit A, the complaint and arrest warrant, MCNICOLL was photographed inside the Capitol on January 6, 2021.  In several of the photographs, MCNICOLL is holding what appears to be a cell phone and appears to be taking photographs or video recording the events.  See Exhibit A, page 4.

**B.   McNicoll's Arrest**

9.   On June 23, 2021, the Honorable Robin M. Meriweather, United States Magistrate Judge, District of Columbia, authorized the arrest of MCNICOLL for the Subject Offenses (21-MJ-00491). The arrest warrant and affidavit are attached as Exhibit A and fully explain MCNICOLL's participation in the events at the U.S. Capitol on January 6, 2021.  Exhibit A is incorporated by reference herein.

10.   On June 28, 2021, MCNICOLL was arrested by the FBI and appeared before the Honorable Karen E. Scott, United States Magistrate Judge for an initial appearance.  MCNICOLL was released on bond pending further proceedings in the charging district.

**C.   Subject Phone**

11.   The SUBJECT PHONE was recovered from the person of MCNICOLL at the time of her arrest.  The SUBJECT PHONE is a Samsung Galaxy Note 10, Model # SM-N975U, the IMEI number is 359271103372623, and the phone number is XXX-XXX-0157.  During my interview, MCNICOLL admitted having her phone with her while she was inside the Capitol on January 6, 2021.  I obtained and reviewed toll records for MCNICOLL and the SUBJECT PHONE for a period that covered January 2021.  I learned that the IMEI of the device associated with MCNICOLL on January 6, 2021 is the same IMEI of the SUBJECT PHONE.  The SUBJECT PHONE has been in the custody of the FBI at the field office in Long Beach, California since its recovery on June 28, 2021.

**D.     USE OF DIGITAL DEVICES AT THE CAPITOL RIOTS**

12.  Based on my training and experience, I know that
individuals traveling outside of their cities of residence to
attend large events, such as the demonstration on January 6,
2021 in Washington D.C., typically carry their cell phones with
them in order to coordinate their travel plans, use web-based
applications to get directions to unfamiliar locations, and
communicate with friends and family both at the event and at
home.  Furthermore, based on my training and experience, I know
that persons who engage in the Subject Offenses will frequently
use digital devices, including cell phones, to conduct their
criminal activities, take (and store) photographs and videos in
order to memorialize their illegal activities, and maintain
contact with others involved with the planning, targeting, and
execution of the Subject Offenses.

13.  In my training and experience, I know that smart
phones are the single most common way in which people now take
photographs and instantly share them with others.  As detailed
below, in my training and experience, camera and messaging
applications on smart phones allow users to take photographs and
video- such as those that were taken during the Capitol Riots -
and communicate with other users.

14.  Based on my review of public news reports following
the events at the U.S. Capitol on January 6, 2021, I know that
many individuals involved in the incident used their cell phones
to take photographs and videos, as well as to share them on
social media applications, both during and after the incident.

The SUBJECT PHONE is also likely to have other evidence of
MCNICOLL's activities, including evidence of her location in the
hours and days leading up to and after the Capitol Riots,
Internet searches she conducted regarding the riots, and
communications with other individuals regarding the riots.  The
SUBJECT PHONE is also likely to have other evidence of the
commission of the Subject Offenses by other rioters who were
near MCNICOLL while MCNICOLL recorded activities at and near the
Capitol.

15.  Accordingly, I believe that evidence of the Subject
Offenses will be found on the SUBJECT PHONE used by MCNICOLL to
prepare for, commit, document, and discuss the Subject Offenses.

### V.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

16.  As used herein, the term "digital device" includes the
SUBJECT PHONE.

17.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remains on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary

directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

18.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

19.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress MCNICOLL's thumbs and/or fingers on the device(s); and (2) hold the device(s) in front of MCNICOLL's face with her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

## VI. **CONCLUSION**

20.  For all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1752(a)(1) (Entering and Remaining on Restricted Buildings or Grounds); 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds); 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building); and 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building) will be found on the SUBJECT PHONE as described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
August, 2021.

_____
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

ITEM TO BE SEARCHED

    The SUBJECT PHONE is a Samsung Galaxy Note 10+, Model #SM-N975U, the IMEI number is 359271103372623, and the phone number is XXX-XXX-0157, currently in the possession of the FBI at the field office in Long Beach, California.

<u>**ATTACHMENT B**</u>

I.   <u>**ITEMS TO BE SEIZED**</u>

1.   The items to be seized are the evidence, contraband, fruits, and instrumentalities of violations of 18 U.S.C. § 1752(a)(1) (Entering and Remaining on Restricted Buildings or Grounds); 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds); 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building); and 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building), namely:

a.   Records or information that constitute evidence of identity, including but not limited to pictures or videos of MCNICOLL, of the U.S. Capitol, or of Washington, D.C., taken or recorded on or about January 6, 2021;

b.   Records or information regarding travel to Washington, D.C., in or around January 2021;

c.   Records or information relating to presence in the U.S. Capitol on or about January 6, 2021;

d.   Records or information relating to the planning of travel to Washington, D.C., or research about the U.S. Capitol;

e.   Communications with other individuals about events at the U.S. Capitol on or about January 6, 2021;

f.   Contact information for other individuals unlawfully present in the U.S. Capitol on or about January 6, 2021;

g.    Records or information relating to ownership or control over the SUBJECT PHONE (Samsung Galaxy Note10+ cellular telephone, Model # SM-N975U, bearing International Mobile Equipment Identity ("IMEI") number 359271103372623, and assigned telephone number XXX-XXX-0157); and

h.    Electronic records or information found on the SUBJECT PHONE consisting of the items listed above.

i.    With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii.    evidence of the attachment of other devices;

iv.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.    evidence of the times the device was used;

vi.   evidence of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to violations of the Subject Offenses;

vii. evidence of MCNICOLL's use or connection to social media accounts;

viii.    passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

ix.   applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

x.   records of or information about Internet Protocol addresses used by the device;

xi.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing

data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

## II. **SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.    In searching digital devices or forensic copies
thereof, law enforcement personnel executing this search warrant
will employ the following procedure:

a.    Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") will, in
their discretion, either search the digital device(s) on-site or
seize and transport the device(s) and/or forensic image(s)
thereof to an appropriate law enforcement laboratory or similar
facility to be searched at that location.  The search team shall
complete the search as soon as is practicable but not to exceed
120 days from the date of execution of the warrant.  The
government will not search the digital device(s) and/or forensic

image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.    The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.    If the search determines that a digital device does not contain any data falling within the list of items to be

v

seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.    If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to

law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.   During the execution of this search warrant, law enforcement is permitted to: (1) depress MCNICOLL's thumbs and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of MCNICOLL's face with her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT
### for the

District of Columbia

United States of America

v.

LOIS LYNN MCNICOLL

*Defendant*

)
)
)
)
)
)

Case: 1:21-mj-00491
Assigned To : Meriweather, Robin M.
Assign. Date : 6/22/2021
Description: Complaint w/ Arrest Warrant

## ARREST WARRANT

To:    Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)*                    Lois Lynn McNicoll                    ,

who is accused of an offense or violation based on the following document filed with the court:

❏ Indictment    ❏ Superseding Indictment    ❏ Information    ❏ Superseding Information    ☒ Complaint
❏ Probation Violation Petition    ❏ Supervised Release Violation Petition    ❏ Violation Notice    ❏ Order of the Court

This offense is briefly described as follows:

18 U.S.C. § 1752(a)(1), (2)—Knowingly Entering or Remaining in any Restricted Building or Grounds Without
                Lawful Authority
40 U.S.C. § 5104(e)(2)(D), (G)—Violent Entry and Disorderly Conduct on Capitol Grounds

Date:  ___June 23, 2021___

2021.06.23
13:28:38 -04'00'

*Issuing officer's signature*

City and state:        Washington, D.C.

Robin M. Meriweather, U.S. Magistrate Judge
*Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____ at *(city and state)* _____ . |
| Date: _____ |
| *Arresting officer's signature* |
| *Printed name and title* |

Case: 1:21-mj-00491
Assigned To : Meriweather, Robin M.
Assign. Date : 6/22/2021
Description: Complaint w/ Arrest Warrant

## STATEMENT OF FACTS

Your affiant, Daniel Dales is a Special Agent (SA) with the Federal Bureau of Investigation (FBI), and has been so employed since July 2017. I am currently assigned to the Los Angeles Field Office's Long Beach Resident Agency Joint Terrorism Task Force (JTTF). My duties at the JTTF include investigating violations of the laws of the United States, specifically investigations related to domestic and foreign terrorism.

Currently, I am a tasked with investigating criminal activity in and around the Capitol grounds on January 6, 2021. As a Special Agent, I am authorized by law or by a Government agency to engage in or supervise the prevention, detention, investigation, or prosecution of violations of Federal criminal law.

The U.S. Capitol is secured twenty-four hours a day by U.S. Capitol Police (USCP). Restrictions around the Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the Capitol. On January 6, 2021, the exterior plaza of the Capitol was also closed to members of the public.

On January 6, 2021, a joint session of the United States Congress convened at the Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on Tuesday, November 3, 2020. The joint session began at approximately 1:00 PM. Shortly thereafter, by approximately 1:30 PM, the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session and then in the Senate chamber.

As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the Capitol. As noted above, temporary barricades and permanent barricades were in place around the exterior of the Capitol. USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

At such time, the certification proceedings were still underway, and the exterior doors and windows of the Capitol were locked or otherwise secured. Members of the USCP attempted to maintain order and to keep the crowd from entering the Capitol. However, around 2:00 PM, individuals in the crowd forced entry into the Capitol. Some members of the crowd gained access and entry to the Capitol by breaking windows and assaulting members of the USCP. Others in the crowd encouraged and assisted those acts.

Shortly thereafter, at approximately 2:20 PM, members of the House of Representatives and Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session of the United States Congress was effectively suspended until shortly after 8:00 PM. Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the Capitol without authority to be there. One of the individuals who was inside the Capitol without authority to be there has been identified as **Lois Lynn McNicoll**.

On or about January 8, 2021, an FBI tipster (Witness 1) provided the screenshot pictured below to the FBI via the national tip submission site. The screenshot appears to be a social media post from ABC7 showing a white female wearing a white hat that has the name TRUMP in dark letters. The female is also pictured wearing a white and gray jacket with a red and white flag draped over her shoulders. The caption on the post states: Trump supporters exit the U.S. Capitol Building.



**IMAGE 1:** *A screenshot provided by Witness 1 of a social media posting from ABC7 NEWS, showing a white female wearing a white hat that has the name TRUMP in dark letters. The female is also pictured wearing a white and gray jacket with a red and white flag draped over her shoulders.*

The defendant and Witness 1 are both employees of the Los Angeles County Department of Public Social Services (DPSS). As such, Witness 1 has personal knowledge of McNicoll's appearance. In their tip, Witness 1 identified the previously described female in IMAGE 1 as the defendant—**Lois McNicoll**. Witness 1 further identified the defendant as a fellow Los Angeles County DPSS employee. On or about May 7, 2021, your affiant interviewed Witness 1 who confirmed their relationship to and identification of the defendant.

On or about February 2, 2021 another tipster (Witness 2) sent the above screenshot to the FBI. Witness 2 also identified the female as **Lois McNicoll**, an employee of Los Angeles County DPSS. Your affiant interviewed Witness 2 on May 10, 2021. Witness 2 is also a fellow Los Angeles County DPSS employee who has personal knowledge of McNicoll's appearance. During the interview, they confirmed that the previously described individual in IMAGE 1 is the defendant.

On or about April 5, 2021, law enforcement acquired California Department of Motor Vehicles (DMV) records for **Lois Lynn McNicoll**, with a date of birth in 1952. The California DMV provided a driver's license for McNicoll with a listed address of San Clemente, California.[1] Your affiant reviewed McNicoll's California driver's license photograph (not pictured) and found that McNicoll's appearance in the DMV photo appeared to be consistent with the individual pictured in IMAGE 1.

On May 14, 2021, your affiant reviewed recordings from the Capitol's CCTV surveillance video recorded on January 6, 2021. Video from a camera near an area known as the Senate Wing Door showed a large group of people entering the Capitol through a door and windows that other individuals had broken open. At approximately 2:55 PM Eastern Standard Time (EST) the video shows the defendant—dressed the same as in IMAGE 1—entering the building and standing near the doorway. In the video, the defendant appears to take pictures or video with a cellphone she removes from inside of her coat.

---

[1] The full address and date of birth was provided in the DMV records but is not included here as this document will be publicly filed.





*IMAGES 2, 3, 4: Screenshots from Capitol CCTV showing the defendant just after she entered the Capitol via the Senate Wing Door at approximately 2:55 PM. At one point, the defendant takes what appears to be a cellphone out from her jacket and moves it around in a manner consistent with recording videos and taking pictures.*

Additional CCTV video shows that the red and white flag draped across McNicoll's shoulders appears to be a variant of California's state flag—The Bear Flag—where the words CALIFORNIA REPUBLIC have been replaced by the words TRUMP COUNTRY. After putting her phone away, the defendant walked down a hallway leading south towards the Capitol Crypt. The defendant stopped and observed the crowd before continuing. CCTV from the Capitol Crypt further shows the defendant walking through the Crypt at approximately 3:32 PM. Law enforcement officers then ushered the defendant and all others out of the Capitol via doors leading out to the southeast plaza, also known as the Memorial Doors.

 



*IMAGES 5, 6, 7: (top left) Screenshots from Capitol CCTV showing the defendant with a modified Bear Flag draped around her shoulders, walking south towards the Capitol Crypt; (top right) an individual that appears to be the defendant walking through the Capitol Crypt; and (bottom) an individual that appears to be the defendant walking through the Capitol Crypt.*

 

***IMAGES 8, 9:*** *(left) Screenshots from Capitol CCTV showing the defendant walking east past a statue of Winston Churchill towards the Memorial Doors; and (right) the defendant walking towards the Memorial Doors.*

 

***IMAGES 1, 10:*** *(left) IMAGE 1 (see above); and (right) a screenshot from the Capitol's CCTV showing the defendant at approximately the same location at approximately the same time—3:33 PM—as IMAGE 1.*





***IMAGES 11, 12:*** *(top) A screenshot from an open source video posted to Twitter (https://twitter.com/mattmiller757/ status/1346944869588230144) showing the defendant and others leaving the Capitol through the Memorial Doors; and (bottom) a screenshot from Capitol CCTV showing the defendant walking out the Memorial Doors at approximately the same location at approximately the same time as IMAGE 11.*

On May 18, 2021, your affiant interviewed the defendant at her place of employment in a non-custodial capacity. The defendant was informed that any participation was voluntary and that she was free to terminate the interview at any time. The defendant affirmed that she understood.

The defendant stated in sum and substance that she learned via YouTube that former President Trump (Trump) would be speaking in Washington D.C. (D.C.) on January 6, 2021. The defendant further stated that accordingly, she traveled from California to D.C. on January 2 or 3, 2021, to be able to attend his speech. On January 4 and 5, 2021, she walked around D.C. sightseeing. On those days, she visited the Capitol building, but did not get close to the building because of the barriers around the Capitol. The defendant specifically stated that she recalled the barriers that restricted access to the Capitol.

On January 6, 2021, the defendant attended Trump's speech and stayed for its entirety. She then marched to the Capitol with a large group, walking up the stairs of the Capitol building and entering through doors that had already been forced open. The defendant claimed that at that point, she was somewhat unaware of what was going on around her. The defendant further stated that she recalled walking around an area she referred to as "the Rotunda."[2]

During the interview, the defendant denied taking any photos or video while inside the Capitol. The defendant further claimed that her phone was inside of her purse, which was inside of her jacket, neither of which she ever removed. This claim is inconsistent with what Capitol CCTV shows as depicted in this document as IMAGES 3 and 4.

At some point while she was in the Capitol, the defendant heard someone say that a person had been shot, that the National Guard was being called in, and that there would be a curfew in place. At this time, the defendant states that she decided to leave the Capitol and return to her hotel.

When asked if she had ever been to the Capitol before, the defendant told your affiant that she visited once previously, approximately five years earlier. The defendant recalled that she was required to set up the visit to the Capitol through her state representative, and that the representative had to issue a visitor credential before she could enter the Capitol. On the date of her prior visit to the Capitol, the defendant also remembered going through metal detectors before being allowed to enter. The defendant admitted that she did not go through these same security measures on

---

[2] The defendant was likely referring to the Capitol Crypt as there is no indication that the defendant entered the actual Rotunda of the Capitol.

Exhibit A
Page 9 of 10

January 6, 2021. Be that as it may, the defendant claimed that she did not feel that she was doing anything wrong when she entered the Capitol on January 6, 2021.

Your affiant showed the defendant a copy of IMAGE 1, the screenshot from ABC7's post on social media. The defendant—**Lois Lynn McNicoll**—identified the person pictured in IMAGE 1 as herself.

Based on the foregoing, your affiant submits that there is probable cause to believe that **Lois Lynn McNicoll** violated 18 U.S.C. §§ 1752(a)(1) and (2), which make it a crime to (1) knowingly enter or remain in any restricted building or grounds without lawful authority to do; and (2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engage in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions; or attempts or conspires to do so. For purposes of 18 U.S.C. § 1752, a "restricted building" includes a posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service, including the Vice President, is or will be temporarily visiting; or any building or grounds so restricted in conjunction with an event designated as a special event of national significance.

Your affiant further submits there is also probable cause to believe that **Lois Lynn McNicoll** violated 40 U.S.C. §§ 5104(e)(2)(D) and (G), which make it a crime to willfully and knowingly (D) utter loud, threatening, or abusive language, or engage in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress; and (G) parade, demonstrate, or picket in any of the Capitol Buildings.

_____
Special Agent Daniel Dales
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone, this 23rd day of June 2021.

2021.06.23
13:27:14 -04'00'

_____
ROBIN M. MERIWEATHER
U.S. MAGISTRATE JUDGE